United States District Court
Southern District of Texas
**ENTERED**
June 02, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NABEEL IQBAL, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-19-3608 |
| | § | |
| CITY OF PASADENA *et al*., | § | |
| | § | |
| *Defendant*. | § | |

**MEMORANDUM OPINION AND ORDER**

Pending before the court are both Iqbal's and the City of Pasadena's ("the City") motions for summary judgment. Dkts. 44, 45. Both parties filed responses and replies. Dkts. 51, 52, 55, 57. Having considered the motions, responses, replies, amended supplements, and applicable law, the court is of the opinion that the City's motion for summary judgment should be GRANTED IN PART and DENIED IN PART, and Iqbal's motion for summary judgment should be DENIED.

**I. BACKGROUND**

This is an employment discrimination case. Iqbal worked in the City's library for over five years until he was terminated in 2019. Dkt. 44 at 7; Dkt. 44-3 at 2.[1] Iqbal suffers from autism and an anxiety disorder. Dkt. 44 at 7. Iqbal's impairments cause significant limitations, including "some cognitive and self-help skills limitations," along with limitations on his ability to "use good judgment when confronting practical situations." *Id.* at 8. His intellectual skills are also limited, and he sometimes engages in "stereotypic and repetitive physical behaviors," like rocking and pacing. *Id.*

---

[1] For ease of understanding, the court references the electronic page numbers on all exhibits rather than the pagination on the exhibits themselves.

Thus, when Iqbal interviewed for a part-time position as a book shelver at the City library in 2013, Iqbal's father, a longtime employee of the City, attended the interview with him. *Id.*; Dkt. 44-5 at 6–7. The City offered Iqbal the job, and he began working for the City on September 25, 2013. Dkt. 44 at 7. After several years during which Iqbal was described as a "good employee," Iqbal was promoted to a full-time position, which became effective on December 31, 2018. Dkt. 44 at 9; Dkt. 44-15 at 2. However, on December 26, 2018, during Iqbal's lunch break in the shared breakroom area, Iqbal "became aroused . . . and began touching his private parts through his clothing" while watching a video on his phone. Dkt. 1 at 6; Dkt. 44 at 9. Iqbal did not know anyone else was in the breakroom at the time, but another employee, Rosario Noyola, witnessed Iqbal's behavior. Dkt. 44 at 9; Dkt. 45 at 6. Noyola reported the incident to Iqbal's supervisor, Minoo Monakes. Dkt. 45 at 6.

Approximately a week later, Daniel Pennington, the City's human resources director, notified Iqbal's father that another employee had filed a sexual harassment claim against Iqbal. Dkt. 1 at 7. Pennington noted that Mark Anderson, Iqbal's department supervisor, and Detective Reyes, a police officer "who regularly handle[d] the City's investigations for serious human resources complaints," planned to meet with Iqbal to question him about the allegations. Dkt. 45 at 6. Iqbal's father asked to attend the meeting and requested that either a medical professional knowledgeable about autism or Iqbal's supervisor, Monakes, attend the meeting because Iqbal's father was concerned about "how [Iqbal] would react, his inability to defend himself or to fully explain the details of what occurred, [and his inability] to give context to his actions based on his disability." Dkt. 44-14 at 3.

Monakes also separately expressed concern about Iqbal to Pennington and asked if an autism professional or Iqbal's father should attend the meeting. Dkt. 44-23 at 2. She stated that

Iqbal is "autistic and stresses or panics over small things easily" and reported that she was concerned that "he might panic in [the] meeting." *Id.* Pennington at first said Iqbal's father could attend the meeting, but then he changed his mind because he "did not think it would be necessary" since (1) Iqbal's father had not "witness[ed] the incident," and (2) Iqbal "seemed to understand well enough on his own." Dkt. 44-20 at 10. However, according to Iqbal's father, Pennington stated that he could not attend the meeting with his son because, if Iqbal could work full time, then Iqbal "should be able to handle [the meeting] on his own." Dkt. 44-14 at 2.

Thus, only Iqbal, Anderson, and Detective Reyes were present during the meeting, and Iqbal was terminated that same day. Dkt. 44-6 at 5; Dkt. 44-25 at 2. During the meeting, according to Detective Reyes, Iqbal admitted that he had touched himself inappropriately in the breakroom and apologized repeatedly. Dkt. 51-2 at 3. He allegedly admitted that he had engaged in the same behavior in the past while at work but promised never to do it again. *Id.* Further, according to Detective Reyes, Iqbal did not request that anyone assist him during the meeting and instead specifically requested that his father not be informed about the incident or the meeting. Dkt. 51-8 at 2.

In Iqbal's deposition, he stated that he was very nervous during the meeting and that he had needed someone's help during the meeting "[t]o protect [him] so [he] wouldn't get fired and lose [his] job." Dkt. 44-17 at 7, 11. Specifically, Iqbal stated that if someone had been there for him during the meeting, then he "wouldn't be losing [his] job" and "would be working and wouldn't lose [his] insurance and benefits." Dkt. 51-1 at 11. However, Iqbal also acknowledged that, even if another person had been in the room with him to assist him in the meeting, his answers to Detective Reyes' questions would have stayed the same. *Id.* at 13.

After the City terminated Iqbal, Iqbal's father requested a meeting with Pennington at which Iqbal's father talked to Pennington about "clearing [Iqbal's] record" so that they would not have to "pursue [a] lawsuit." Dkt. 51-9 at 3–4. According to Pennington, Iqbal asked that the City forgive Iqbal for touching himself inappropriately in the breakroom and that the City reinstate him because Iqbal did "not appreciate the inappropriateness" of his conduct. Dkt. 51-7 at 4. The City declined to reinstate Iqbal. *Id.*

Iqbal then tried to appeal the termination, but the City said he was not entitled to appeal because he was a probationary employee. Dkt. 44-29 at 2. Iqbal tried to appeal a second time by sending a letter to the City to distribute to the Pasadena City Council after he found out that his termination was scheduled to be confirmed in a Pasadena City Council meeting, but Iqbal's second attempt to appeal was also unsuccessful. Dkt. 44-30.

On June 21, 2019, Iqbal filed a charge of discrimination with the Equal Employment Opportunity Commission. Dkt. 1 at 3. He received a notice of right to sue on July 1, 2019. *Id.* On September 24, 2019, Iqbal filed this lawsuit. *Id.* On November 12, 2019, the City moved to dismiss Iqbal's claims. Dkt. 5. The court granted the motion in part and denied the motion in part. Dkt. 19. The parties' cross-motions for summary judgment on Iqbal's remaining claims are ripe for disposition.

## II. LEGAL STANDARD

A court shall grant summary judgment when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] fact is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material

4

fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). If the moving party meets its burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e).

When both parties move for summary judgment, both "motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Shaw Constructors v. ICF Kaiser Engineers, Inc.*, 395 F.3d 533, 539 (5th Cir. 2004). "[W]here both parties have moved for summary judgment, as to each party's motion, all inferences on summary judgment must be drawn in favor of the non-moving party, to the extent that if there appears to be some evidentiary support for the disputed allegations, that motion must be denied." *Donner v. Barnhart*, 285 F. Supp. 2d 800, 808 (S.D. Tex. 2002), *aff'd*, 104 F. App'x 371 (5th Cir. 2003). "If there is no genuine issue of material fact and one or the other party is entitled to prevail as a matter of law, a court will render judgment." *Standard Ins. Co. v. Corgill*, No. 3:13-CV-00997, 2013 WL 12101080, at *2 (N.D. Tex. July 23, 2013).

### III. ANALYSIS

**A. Disability Discrimination Claim**

Both Iqbal and the City move for summary judgment on Iqbal's disability discrimination claim under the Americans with Disabilities Act ("ADA"). Dkts. 44, 45. To prevail, Iqbal must "either present direct evidence that [he] was discriminated against because of [his] disability or

alternatively proceed under the burden-shifting analysis first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973), a Title VII case." *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014). Iqbal does not present direct evidence of discrimination, so the court applies the burden-shifting analysis, which requires Iqbal to first establish a prima facie case of discrimination. *Id.* In the Fifth Circuit, to make a prima facie showing, Iqbal must establish that (1) he has a disability; (2) he was qualified for his job; and (3) he was "subject to an adverse employment decision on account of his disability."[2] *Id.* at 695 (quoting *Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 853 (5th Cir. 1999)). The burden of production then shifts to the City to articulate a legitimate, nondiscriminatory reason for Iqbal's

---

[2] Both parties contend that Iqbal must show that he was "replaced by a non-disabled person or was treated less favorably than non-disabled employees" as part of his prima facie showing of discrimination. Dkt. 44 at 15 (citing *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995)); Dkt. 51 at 11. But this is not a requirement of a disability discrimination claim under the ADA—in the Fifth Circuit, "rather than articulating the standard for a prima facie discriminatory-discharge claim," a showing that a plaintiff was treated less favorably or replaced by a non-disabled person "is best understood as providing one possible way to prove [a] nexus between the employee's disability and her termination." *LHC Grp.*, 773 F.3d at 696; *see also Austgen v. Allied Barton Sec. Servs., L.L.C.*, 815 F. App'x 772, 777 (5th Cir. 2020) (requiring disability discrimination plaintiff to prove only "that (1) he is a qualified individual; (2) that he has a disability; and (3) that he suffered a negative employment action because of the disability"); *Gonzalez v. United Parcel Serv.*, 777 F. App'x 735, 737–38 (5th Cir. 2019) (same); *Weed v. Sidewinder Drilling, Inc.*, 245 F. Supp. 3d 826, 837 (S.D. Tex. 2017) (Harmon, J.) (discussing the required three elements of a prima facie case of disability discrimination under the ADA in the Fifth Circuit and noting that "there is no necessity for comparators under this test"); *Sudduth v. Tex. Health & Hum. Servs. Comm'n*, No. A-13-CA-918-SS, 2015 WL 12860407, at *4 (W.D. Tex. July 13, 2015) (noting that the Fifth Circuit has addressed its split in authority on the required elements for a prima facie case of disability discrimination and applying a "three-element formulation"). *But see, e.g.*, *McCollum v. Puckett Mach. Co.*, 628 F. App'x 225, 230 (5th Cir. 2015) (requiring an ADA plaintiff to show that "he was replaced by or treated less favorably than non-disabled employees" as an element of his prima facie case of discrimination). Accordingly, the court finds that Iqbal does not have to provide evidence of a comparator to establish a prima facie case of disability discrimination under the ADA.

termination. *Id.* at 694. Lastly, the burden shifts back to Iqbal to show that the City's proffered reason is pretextual. *Id.*

### 1. Prima Facie Case

With regard to the prima facie case, it is undisputed that Iqbal has a disability and was qualified for his position. Dkts. 44, 45, 51, 52, 55, 57. It is also undisputed that Iqbal's termination constitutes an adverse employment action. *Id.* The parties disagree only as to whether Iqbal can establish that he was terminated on account of his disability. *Id.*

The City contends that it is entitled to summary judgment because "the evidence indisputably shows, and Plaintiff admits, the City fired Plaintiff solely for the act of masturbating in an employee breakroom." Dkt. 45 at 11 (citing Dkt. 51-1 at 5, 9). But Iqbal did not admit that he was fired solely for his misconduct in the breakroom—during Iqbal's deposition, Iqbal stated only that he told his father that he was being fired because of the incident in the breakroom and that "[t]he reason I got fired from the City of Pasadena is because I didn't—I did a wrong thing." Dkt. 51-1 at 5, 9. When asked whether he told his father that he was being fired for any other reason besides the incident in the breakroom, he said that he did not know. Dkt. 52 at 7; Dkt. 52-2 at 3.

Further, Iqbal submits evidence which suggests that a reasonable juror could find that the City terminated Iqbal because of his disability. When Iqbal's father asked to attend the City's investigative meeting, Pennington allegedly told him that if his son could work full-time, then Iqbal should be able to attend the meeting on his own. Dkt. 44-14 at 3. Monakes also told Pennington that Iqbal was autistic and that she was worried Iqbal would panic during the meeting if he attended it alone. Dkt. 44-23 at 2. Still, the City did not allow Iqbal's father or Monakes to attend the meeting with Iqbal. Dkt. 44-6 at 5. After the investigative meeting, according to Iqbal's

father, Pennington walked Iqbal across the street to Pasadena City Hall and left him there, even though Pennington knew that Iqbal depended on his father for transportation. Dkt. 44-14 at 4. At that point, Iqbal allegedly called his father to ask him to come pick him up, but Iqbal could not even tell his father where he was. *Id.* He apparently believed he was at a police station. *Id.* Iqbal's father eventually realized where he was and was able to find him only because of Iqbal's description of the building. *Id.* Viewing the evidence in the light most favorable to Iqbal and drawing all reasonable inferences in his favor, the court concludes that a genuine dispute of material fact exists as to whether the City terminated Iqbal on account of his disability. Accordingly, the burden shifts to the City to produce a legitimate, non-discriminatory reason for Iqbal's termination.

### 2. Legitimate Non-Discriminatory Reason

"If the employer produces any evidence, which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action, then the employer has satisfied its burden of production." *Daigle*, 70 F.3d at 396 (cleaned up). The City has put forth sufficient evidence from which a reasonable juror could conclude that it terminated Iqbal for the legitimate, nondiscriminatory reason of inappropriately touching himself in the breakroom. *See, e.g.*, Dkts. 51-1, 51-2, 51-7, 51-13. Iqbal allegedly admitted to his misconduct and said that he had engaged in similar misconduct at work before. Dkt. 51-2 at 3. Another employee witnessed the misconduct. *Id.* at 2. Therefore, the City has satisfied its burden of production, and the burden shifts back to Iqbal to establish a genuine issue of material fact that the City's proffered reason is pretextual.

### 3. Pretext

"[A]n employee must present 'substantial evidence' that the employer's legitimate, nondiscriminatory reason for termination is pretextual." *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 480 (5th Cir. 2016) (quoting *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 233 (5th Cir. 2015)). "In pretext cases, it is not enough that the [employer] was wrong about the underlying facts that motivated the adverse employment action. The only question is whether the employer had a good-faith belief that the facts that motivated the adverse action were true."[3] *Lucas v. T-Mobile USA, Inc.*, 217 F. Supp. 3d 951, 957 (S.D. Tex. 2016) (Rosenthal, J.). "Pretext is established either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Delaval*, 824 F.3d at 480 (cleaned up).

Iqbal contends that the City's proffered reason for his termination was pretextual because he was treated less favorably than employees who are not disabled when he was terminated without a warning, counseling, or other progressive discipline for his first and only misconduct at work. Dkt. 44 at 23–25, 27–28. "In discrimination cases, we compare the treatment of other employees whose conduct is 'nearly identical' to the plaintiff's conduct and who were treated more favorably than the plaintiff." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 901 (5th Cir. 2002) (quoting

---

[3] In Iqbal's amended supplement, he contends that while his behavior may have been "objectively severe," the court "must consider the totality of the circumstances," especially that Iqbal "never intended to sexually harass anyone." Dkt. 62 at 1–2 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S. Ct. 998 (1998)). But *Oncale* is irrelevant—it addresses the question of whether same-sex harassment is covered by Title VII's prohibition against sex discrimination. The real issue in Iqbal's case "is whether [the City] reasonably believed [Noyola's] allegation." *Waggoner v. City of Garland*, 987 F.2d 1160, 1165 (5th Cir. 1993). "[T]he inquiry is limited to whether the employer believed the allegation in good faith and whether the decision to discharge the employee was based on that belief." *Id.* at 1165–66. Accordingly, whether Iqbal intended his conduct is not relevant to his ADA claims.

9

*Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507 (5th Cir. 2001)). "If the 'difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts* for the difference in treatment received from the employer,' the employees are not similarly situated for the purposes of an employment discrimination analysis." *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001)). Iqbal has not identified a non-disabled employee who engaged in similar misconduct and received more favorable treatment than Iqbal. One employee identified by Iqbal as a comparator verbally attacked another City employee and was placed on a performance improvement plan and suspended for several days. Dkt. 44 at 27; Dkt. 44-27 at 3–4. Another made a "rude comment" about a fellow employee and exhibited "unprofessionalism" by acting disrespectfully toward customers. Dkt. 44-46 at 3. Yet another employee was suspended for violating several City policies, but the exhibit to which Iqbal cites includes only a list of the types of violations of which the employee was accused—it does not show that the employee was non-disabled or that the employee engaged in similar conduct but was treated better than Iqbal. Dkt. 44-47 at 2. The only comparator that a reasonable juror may find had engaged in similarly egregious conduct stole various items from the City library and purposefully manipulated library records to hide the thefts. Dkt. 44-45 at 3–4. But the exhibit to which Iqbal cites shows that this employee was also terminated and referred to the Pasadena Police Department. *Id.* Thus, there is no evidence that she was (1) not disabled or (2) treated more favorably than Iqbal. *Id.* None of the aforementioned comparators are appropriate comparators, and they do not create an issue of material fact that the City's proffered reason for Iqbal's termination was a pretext for discrimination.

However, Iqbal additionally argues that there is a genuine dispute of material fact as to whether the City's reason for his termination was pretextual because the City refused to allow

10

Iqbal an opportunity to appeal his termination. Dkt. 44 at 25–26, Dkt. 52 at 6–7. The City contends that Iqbal was not allowed to appeal his termination because he was a probationary employee. Dkt. 51 at 13. According to the City, "in order to appeal an 'indefinite suspension,' the City's term[] for firing, the employee must have worked full-time and complete[d] a one-year probationary period, . . . which starts when an employee begins work as a full-time City employee." *Id.* Iqbal contends that the City's policy requires only a one-year probationary period—not one year as a full-time employee—and thus, he should have been allowed to appeal because (1) he had been employed by the City as a part-time employee for over five years before his termination, and (2) he was a full-time employee at the time of his termination. Dkt. 44 at 25–26. The City's appeal policy states that "[f]ull-time employees who have completed their probationary period may appeal an indefinite suspension or termination to City Council." Dkt. 44-40 at 2. The City's probation policy states the following:

> All employees shall be required to complete successfully a one-year probation period. A probationary employee may be terminated at any time during such probation period for any reason. The employee does not have recourse to appeal his dismissal to City Council. Any full-time employee that leaves the employment of the City for any reason and is later reemployed, must successfully complete a new one year probationary period.

Dkt. 44-37 at 2. The City's policy is seemingly silent as to Iqbal's situation—it does not address whether moving from a part-time position to a full-time position restarts an employee's probationary period. And in Pennington's deposition, when asked about the City's probation policy and whether Iqbal had "to be a full-time employee for one year in order to successfully complete a one-year probation period," he said no.[4] Dkt. 44-20 at 11.

---

[4] In opposition to Iqbal's motion for summary judgment, the City submits Daniel Pennington's declaration, which contradicts his deposition testimony. *Compare* Dkt. 44-20 at 11, *with* Dkt. 51-

11

"At the end of the day, the pretext inquiry asks whether there is sufficient evidence 'demonstrating the falsity of the employer's explanation, taken together with the prima facie case,' to allow the jury to find that discrimination was the but-for cause of the termination." *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 478 (5th Cir. 2015) (quoting *Sandstad*, 309 F.3d at 897). On this record, viewing the record as a whole and drawing all reasonable inferences in Iqbal's favor, a reasonable juror could find that the City's proffered reason for Iqbal's termination was pretextual. However, a reasonable juror could also find that the City's proffered reason is not pretextual and that the City terminated Iqbal only because of his inappropriate behavior in the breakroom. Thus, a genuine dispute of material fact remains, and both the City's and Iqbal's motions for summary judgment on Iqbal's disability discrimination claim are DENIED.

## B. Failure-to-Accommodate Claim

Both Iqbal and the City also move for summary judgment on Iqbal's failure-to-accommodate claim. Dkt. 44; Dkt. 45. "A failure-to-accommodate claim requires a showing that: '(1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations.'" *Weber v. BNSF Ry. Co.*, 989 F.3d 320, 323 (5th

---

7 at 4. In his declaration, he states that "[i]n order to appeal an indefinite suspension (firing), a city employee must work full-time and complete a one-year probationary period, which starts when an employee begins work as a full-time employee." Dkt. 51-7 at 4. But "[a]ffidavits submitted in opposition to a motion for summary judgment may supplement deposition testimony, but cannot contradict prior testimony without explanation." *Bouvier v. Northrup Grumman Ship Sys., Inc.*, 350 F. App'x 917, 920 (5th Cir. 2009); *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996) ("It is well settled that this court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony."). The City offers no explanation for the conflicting testimony in Pennington's affidavit. Accordingly, the court will not consider Pennington's statement in his affidavit that the City's probationary period starts only when an employee begins work as a full-time employee.

Cir. 2021) (quoting *Credeur v. Louisiana*, 860 F.3d 785, 792 (5th Cir. 2017)). "An employee's request for an accommodation triggers an obligation on behalf of the employer to engage with good faith in an interactive process to identify an appropriate accommodation." *Jurach v. Safety Vision, LLC*, 642 F. App'x 313, 318 (5th Cir. 2016). However, only "when an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee" does that employer violate the ADA. *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999); *see also Salem v. Hous. Methodist Hosp.*, No. CIV.A. 4:14-1802, 2015 WL 6618471, at *8 (S.D. Tex. Oct. 30, 2015) ("[F]ailure to participate in an interactive process does not—in and of itself—constitute a violation of the ADA.") (Atlas, J). Neither party disputes that Iqbal is a qualified individual with a disability. However, even assuming without deciding that Iqbal can establish that the City failed to engage in good faith in the interactive process, Iqbal's failure-to-accommodate claim fails as a matter of law because the City's alleged failure to engage in the interactive process did not lead to a failure to reasonably accommodate Iqbal.

A "reasonable accommodation" as defined in the ADA includes but is not limited to "making existing facilities used by employees readily accessible to and usable by individuals with disabilities," "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9).

> The ADA, its implementing regulations, and the EEOC's interpretive guidance make clear that an employer's obligation to provide a 'reasonable accommodation' . . . contemplates changes to

13

> an employer's procedures, facilities, or performance requirements that will permit a qualified individual with a disability to perform the essential functions of his or her job.

*Burch v. Coca-Cola Co.*, 119 F.3d 305, 314 (5th Cir. 1997). "In all cases a reasonable accommodation will involve a change in the status quo, for it is the status quo that presents the very obstacle that the ADA's reasonable accommodation provision attempts to address." *Id.*

The Fifth Circuit has explicitly rejected the requirement that requested modifications must be related to essential job functions to constitute a reasonable accommodation. *Feist v. La., Dep't of Just., Off. of the Att'y. Gen.*, 730 F.3d 450, 453 (5th Cir. 2013). In *Feist*, the court found that reserved on-site parking for a plaintiff with osteoarthritis of the knee might be a reasonable accommodation, even though it was not related to an essential function of the job. *Id.* Likewise, a district court rejected a defendant employer's argument that the ADA requires accommodations only when they are necessary to perform essential functions of the job and found that "[s]ubstantial evidence at trial established that a service dog mitigated the effects of [the plaintiff's] PTSD by reducing the pain and hardship of his disability while at work." *Alonzo-Miranda v. Schlumberger Tech. Corp.*, No. 5:13-CV-1057, 2015 WL 13768973, at *2 (W.D. Tex. June 11, 2015).

Still, "the ADA requires employers to reasonably accommodate limitations, not disabilities." *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 164 (5th Cir. 1996). "[T]he ADA does not require an employer to assume that an employee with a disability suffers from a limitation." *Id.* "[I]t is incumbent upon the ADA plaintiff to assert not only a disability, but also any limitation resulting therefrom." *Id.* Iqbal points to two separate requests that he contends were requests for reasonable accommodation. Dkt. 44 at 33. First, Iqbal notes that when Monakes spoke to Pennington about Iqbal, she told Pennington that Iqbal would panic if someone were not present with him in the City's investigative meeting and asked if an autism professional or Iqbal's

14

father should attend the meeting.  *Id.*; Dkt. 44-23 at 2.  Iqbal contends that this was a request for accommodation on his behalf.  Dkt. 44 at 33.  Iqbal also argues that his father's request that either Iqbal's father, Monakes, or a medical professional attend the meeting with Iqbal was an additional request for accommodation.  *Id.*

Assuming without deciding that Iqbal's father's request and Monakes' request constitute requests for accommodation on Iqbal's behalf, Iqbal's reasonable accommodation claim still fails as a matter of law—even if Iqbal has established a genuine dispute of material fact as to whether the City participated in the interactive process in good faith, this failure cannot be said to have led to a failure to reasonably accommodate him.  Iqbal contends that he needed "a representative to assist him in articulating what actually occurred during the incident and how his disability was a relevant factor that should be considered prior to discipline."  *Id.* at 37–38.  But in Iqbal's deposition, when asked whether his answers to Detective Reyes' question "would have been [the] same whether [he was] alone with the detective or if there were other people there," he answered affirmatively that his answers would have been the same whether someone was with him during the meeting or not.  Dkt. 51-1 at 13.  When asked whether he needed help "to answer Detective Reyes' questions truthfully," he stated that he did need some help, but when asked what help he needed, he said "[t]o protect me so I wouldn't get fired and lose my job."  Dkt. 44-17 at 11.  The court is sympathetic to Iqbal's contention that, in light of his disability, he felt "tremendously frightened and anxious" during the interrogation and would have felt more comfortable with someone in the room to assist him.  Dkt. 44 at 11; Dkt. 44-17 at 11.  In Iqbal's father's deposition, Iqbal's father stated that he wanted to attend the meeting with Iqbal because he "wanted to be there to comfort [Iqbal] and help [Iqbal] with his interrogation."  Dkt. 44-10 at 12.  That said, while the court understands Iqbal's father's desire to be there for his son, under the facts as presented, neither

15

Iqbal nor his father have asserted a specific limitation caused by Iqbal's disability which made it impossible for him to attend the meeting with the City on his own.[5]  Iqbal fails to provide summary judgment evidence showing a limitation resulting from his disability that required a modification to the City's investigative meeting.  Accordingly, even if Iqbal has established a genuine issue of material fact as to whether the City participated in the interactive process in good faith, this dereliction cannot be said to have led to a failure to reasonably accommodate him.  Iqbal has not demonstrated a genuine issue of material fact that would allow a reasonable jury to determine there was an ADA violation, and Iqbal's failure-to-accommodate claim fails as a matter of law.

## IV. CONCLUSION

For the aforementioned reasons, Iqbal's motion for summary judgment is DENIED.  The City's motion for summary judgment is GRANTED IN PART and DENIED IN PART.  The City's motion for summary judgment on Iqbal's reasonable accommodation claim is GRANTED, and Iqbal's reasonable accommodation claim is DISMISSED WITH PREJUDICE.  The City's motion for summary judgment on Iqbal's disability discrimination claim is DENIED, and Iqbal's disability discrimination claim remains before the court.

Signed at Houston, Texas on June 1, 2021.

_____
Gray H. Miller
Senior United States District Judge

---

[5] The court recognizes that the court's reliance on the City's exclusion of Iqbal's father and Monakes from the City's investigative meeting in denying summary judgment for Iqbal's disability discrimination claim might seem, at first glance, inconsistent with the court's ruling on Iqbal's reasonable accommodation claim.  However, each of Iqbal's claims must be analyzed separately, and the requirements for a reasonable accommodation claim are different than the requirements for a disability discrimination claim.  *Compare LHC Grp.*, 773 F.3d at 694–97 (discussing the *McDonnell Douglas* framework for discrimination claims), *with Weber*, 989 F.3d at 323 (discussing the elements of a reasonable accommodation claim).